**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GARY TAYON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16 CV 1404 DDN |
| | ) | |
| NANCY A. BERRYHILL,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the Commissioner of Social Security finding that plaintiff Gary Tayon is not disabled and, thus, not entitled to Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1385. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Commissioner is affirmed.

## I.    BACKGROUND

Plaintiff was born on June 23, 1970. (Tr. 1033). He has made six applications for Social Security benefits since July 1999. (Tr. 238, 612). In October 2006, one was granted, with an onset date of August 10, 2004. (Tr. 238, 612). Plaintiff received SSI benefits until April 2009, when his benefits were terminated because of his incarceration. (Tr. 10, 143, 612).

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Ms. Berryhill is hereby substituted for Carolyn W. Colvin as Acting Commissioner of Social Security and as the defendant in this action. 42 U.S.C. § 405(g) (last sentence).

Plaintiff filed the application for SSI at issue in this case on October 20, 2010, alleging an onset date of August 10, 2004. (Tr. 187). Plaintiff claims that he is bi-polar, schizophrenic, and borderline incompetent, and that these conditions limit his ability to work. (Tr. 242). Plaintiff's application was denied on December 21, 2010, and he requested a hearing before an administrative law judge ("ALJ"). (Tr. 104-112). A hearing was held in August 2011, where plaintiff and a vocational expert ("VE") testified. (Tr. 58-77). A supplemental hearing was held on May 20, 2013, with plaintiff and the same VE testifying. (Tr. 35-57). By decision dated May 30, 2013, the ALJ found that plaintiff was not disabled under the Social Security Act. (Tr. 7-29). The ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform jobs available in significant numbers in the national economy. *Id.*

On May 1, 2014, the Appeals Council of the Social Security Administration denied plaintiff's request for review of the ALJ's decision. (Tr. 1-4). Plaintiff sought judicial review of this final decision on June 30, 2014, and the reviewing court reversed and remanded on May 28, 2015, for further development of the record regarding plaintiff's mental impairments. (Tr. 678-86). *See Tayon v. Colvin*, 4:14 CV 1180 RLW (Docs. 1, 30). On remand, an additional hearing was held before a second ALJ, in January 2016. (Tr. 1012-1067). On February 25, 2016, this second ALJ also determined that plaintiff is not disabled. (Tr. 608-37). The Appeals Council declined to assume jurisdiction, making the ALJ's decision after remand the final decision of the Commissioner to be reviewed in this case. (Tr. 602-05).

Plaintiff argues that the second decision is not supported by substantial evidence. Specifically, he asserts that the ALJ erred in according "little" weight to the opinion of plaintiff's treating mental health counselor, according the opinion of plaintiff's treating psychiatrist "limited" weight, and in failing to consider plaintiff's need for a structured setting. (Doc. 17). Plaintiff asks that the ALJ's decision be reversed and an award of benefits entered or that the case be remanded for further evaluation.

## A.    Medical Record and Evidentiary Hearing

Plaintiff reportedly began experiencing psychiatric symptoms requiring treatment in 1995, when he was engaged in drug abuse. (Tr. 360, 376, 468). He was hospitalized for suicidal ideation and treated for polysubstance addiction in 1999. (Tr. 360). Throughout 2005 and 2006, he received treatment for depression, anxiety, and substance abuse. (Tr. 377, 542-45). His treating psychiatrist at that time, M. Asif Qaisrani, M.D., opined in June 2006 that plaintiff had a Global Assessment of Functioning ("GAF") score of 51.[2] (Tr. 542-45).

In March 2009, plaintiff was arrested on a charge of purchasing pseudoephedrine with the knowledge that it would be used to manufacture a controlled substance, following which he underwent four competency evaluations. (Tr. 358). First, in May 2009, forensic psychologist Gordon M. Zilberman, Ph.D., performed a clinical interview. (Tr. 358-63). Dr. Zilberman observed that plaintiff had poor grooming, barely coherent thought processes, elevated mood, and difficulty expressing himself. (Tr. 360). He noted that plaintiff was sleeping very little, eating excessively, and not fully compliant with his prescribed medications. (Tr. 361). Dr. Zilberman diagnosed plaintiff with bipolar affective disorder and a prior history of amphetamine, cocaine, and cannabis abuse. (Tr. 361).

Dr. Zilberman also administered objective tests to assess plaintiff's intellectual functioning. (Tr. 359-64). Plaintiff reported that he had learning problems in school, repeated fourth grade, and dropped out of school after tenth grade. (Tr. 359). Dr. Zilberman administered the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"), and plaintiff received an IQ score of 78, with subtest scores ranging from 72 to 92.

---

[2] A GAF score represents a clinician's judgment of an individual's overall ability to function in social or occupational settings, not including impairments due to physical or environmental limitations. *Diagnostic & Statistical Manual of Mental Disorders* (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate some impairment in reality testing or communication or "major" impairment in social or occupational functioning; scores of 41 to 50 reflect "serious" impairment in these functional areas; scores of 51-60 reflect "moderate" impairment; and scores of 61 to 70 indicate "mild" impairment.

(Tr. 361). Plaintiff also took the Wide Range Achievement Test, Fourth Edition, and received scores in the sixth to tenth percentiles in the areas of word reading, sentence comprehension, spelling, and math computation. (Tr. 361). Dr. Zilberman stated that plaintiff's academic abilities appear to be in the below average range and that his present intellectual abilities appear to be in the borderline to low average range of functioning. (Tr. 361). Dr. Zilberman opined that it was highly likely that because of plaintiff's noncompliance with his medication regime, his poorly-controlled psychiatric symptoms impeded his performance on the tests. (Tr. 361-64). Based on these findings, Dr. Zilberman opined that plaintiff's present ability to understand the nature and consequences of the court proceedings brought against him, as well as his ability to properly assist his attorney, were substantially impaired by his mental illness, though it was highly likely that plaintiff's psychiatric symptoms would be much better controlled if he were compliant with his medications. (Tr. 361-64).

In December 2009, Bruce Berger, M.D., and Jill R. Grant, Psy.D., conducted a second forensic evaluation of plaintiff in accordance with a second court order regarding plaintiff's competency to stand trial in his criminal case. (Tr. 364-74). They conducted several clinical interviews and behavioral observations. (Tr. 365). Drs. Berger and Grant noted plaintiff had been fully compliant with his prescribed medications and his symptoms appeared to be better controlled. (Tr. 367-69). They observed that plaintiff occasionally exhibited restlessness, tangential speech, and difficulty focusing. (Tr. 368-69, 372). However, some symptoms were attributed to excessive caffeine consumption. (Tr. 368, 372). They noted that plaintiff responded well to redirection and observed that symptoms were heightened in new environments but decreased as they became more familiar. (Tr. 368-69, 371-72). They diagnosed plaintiff with bipolar disorder and a history of amphetamine abuse and assigned plaintiff a GAF score of 65, corresponding to mild symptoms and limitations. (Tr. 372). Drs. Berger and Grant concluded that so long as plaintiff remained compliant with his medication regimen, he would be able to maintain appropriate focus during the proceedings and was competent to stand trial. (Tr. 372-74).

In February 2010, forensic psychologist Richard G. Scott, Ph.D., examined plaintiff pursuant to his criminal defense attorney's request for another evaluation of his competency to stand trial. (Tr. 375-82). Dr. Scott reviewed plaintiff's medical records and conducted an interview with defendant in jail. (Tr. 375). Dr. Scott observed that plaintiff had an unkempt appearance, distractibility, impaired reasoning, tangential flow of thought, poor insight, and fair judgment. (Tr. 378-80). He opined that plaintiff's legal insight and judgment were impaired by his thought disorder and plaintiff could not apply his factual understanding of the legal proceedings in a rational manner. (Tr. 382). Dr. Scott opined that plaintiff would not be able to communicate effectively with his attorney, track evidence in court, or understand the nature and consequences of the legal proceedings against him. (Tr. 382).

In August 2010, plaintiff underwent a fourth forensic evaluation, again by Drs. Grant and Berger. (Tr. 457-63). They observed that plaintiff had been largely compliant with treatment and his symptoms had responded well to medication, with no periods of mania, hypomania, or depression. (Tr. 459, 462). Drs. Grant and Berger found that plaintiff's anxiety symptoms had improved and that he demonstrated good comprehension skills, positive mood, and cooperative behavior. (Tr. 460). He attended a weekly competency restoration group and participated actively in the group and tried to help other participants when they did not have information. (Tr. 460). He completed a competency questionnaire containing 25 items concerning legal terminology, roles of courtroom personnel, and other legal information, reading over the questionnaire quickly and correctly answering all questions. (Tr. 460). Drs. Grant and Berger assigned plaintiff a GAF score of 70 to 75, representing mild to slight symptoms and limitations. (Tr. 461). They opined that plaintiff had a good factual and rational understanding of his case and could assist his attorney in the preparation of a defense. (Tr. 462-63). They concluded that plaintiff was able to maintain appropriate focus during legal proceedings if he remained compliant with prescribed medications, and that he was competent to stand trial. (Tr. 462-63).

Following his release from federal custody in October 2010, plaintiff received regular treatment from psychiatrist Jhansi Vasireddy, M.D., monthly for one to two years and then every two to three months until 2015.  (Tr. 468-71, 489-500, 520-41, 885-96, 903-08, 945, 966, 993-95, 998).  Dr. Vasireddy diagnosed plaintiff with major depressive disorder, mild; generalized anxiety disorder; personality disorder, not otherwise specified; and polysubstance dependence, in remission.  (Tr. 886, 966).

Throughout his five years of treatment with Dr. Vasireddy, plaintiff occasionally reported symptoms of low mood and isolative behavior, but often told Dr. Vasireddy that he was doing well on medications with good sleep and appetite.  (Tr. 492-98, 520, 523, 525, 526, 529, 533, 535, 537, 885-86, 892-95, 903, 906-07, 966, 970, 977, 989, 993-95, 998).  Dr. Vasireddy observed plaintiff to sometimes have a mildly anxious, flat, or depressed affect, but she also noted that plaintiff demonstrated appropriate mood and affect at many psychiatry visits.  (Tr. 468-71, 492-500, 520-41, 885-96, 903-08, 945, 966, 993-95, 998).  Plaintiff consistently exhibited pleasant, cooperative behavior and adequate grooming and hygiene.  (Tr. 468-71, 489-500, 520-41, 885-96, 903-08, 945, 966, 993-95, 998).  He occasionally demonstrated poor focus in his thought processes, but on many other occasions manifested goal-directed or unremarkable thought processes.  (Tr. 468-71, 489-500, 520-41, 885-96, 903-08, 945, 966, 993-95, 998).  Dr. Vasireddy repeatedly observed plaintiff exhibit normal thought content.  (Tr. 468-71, 489-500, 520-41, 885-96, 903-08, 945, 966, 993-95, 998).  She generally observed him to exhibit fair insight and judgment, normal psychomotor activity, clear speech, and good eye contact, with the absence of mood swings, anxiety, or irritability at appointments.  (Tr. 468-71, 489-500, 520-41, 885-96, 903-08, 945, 966, 993-95, 998).  Plaintiff reported some recurrent symptoms of depressed mood, anxiety, amotivation, social withdrawal, and poor memory, but denied depressive symptoms at other times.  (Tr. 468-71, 489-500, 520-41, 885-96, 903-08, 945, 966, 993-95, 998).  While under Dr. Vasireddy's care, plaintiff remained on largely the same medications, with only a few medication increases or adjustments.  (Tr. 468-71, 489-500, 520-41, 885-96, 903-08, 945, 966, 993-95, 998).  Throughout this period, Dr. Vasireddy frequently assigned a GAF score between 60 and

70, assigning GAF scores in the 50 to 60 range on only two occasions. (Tr. 470, 492-98, 520, 523, 525, 528, 529, 531-33, 886, 892-95, 903-07, 966, 970, 977, 989, 993-95, 998).

As part of plaintiff's treatment with Dr. Vasireddy, plaintiff also met with a counselor, Gina Insalaco, M.A., L.P.C. (Tr. 471). At her first appointment with plaintiff in October 2010, she observed that he had normal thought processes and orientation, but that he had a flat affect, was unable to stay focused and on task, and had poor memory and judgment. (Tr. 475). In November 2010, his mother reported that since his return from prison, he had become much more social: he "now wants to go to stores and get out of the house, where last year he would not leave his bedroom." (Tr. 504). Ms. Insalaco's treatment notes primarily discuss plaintiff's eating habits and social choices. (Tr. 501-04).

In December 2011, Ms. Insalaco opined that plaintiff had experienced social decompensation over the past year, has great social anxiety, cannot communicate effectively in a public environment, and has below average intellectual function. (Tr. 516). She opined that in a public setting, plaintiff would feel highly anxious and may get easily frustrated or have difficulty comprehending instructions, conversing, and staying on topic. (Tr. 516). Ms. Insalaco also opined that plaintiff needs assistance with remembering to take his medications in appropriate dosages. (Tr. 516). She noted that plaintiff purposely avoided family members and isolated himself and she assigned plaintiff GAF scores of 45-55. (Tr. 516).

Plaintiff continued to see Ms. Insalaco through the year 2013. (Tr. 548-66). In June 2012, Ms. Insalaco noted that plaintiff was depressed and staying at home more. (Tr. 560). In November 2012, she noted that plaintiff had fragmented conversation and switched topics quickly. (Tr. 554). In January 2013, she observed that plaintiff had a flat, depressed mood, fragmented ideas, a poor self-concept, and a poor memory, though he also had a normal appearance; had normal thought content; and was oriented to time, place, and person. (Tr. 552). Ms. Insalaco opined that plaintiff has ongoing depression and anxiety and isolates himself socially. (Tr. 553).

From January to December 2014, plaintiff saw counselor Norinee Thomas, M.A., P.L.P.C. (Tr. 960-1009). In January 2014, she observed that plaintiff had normal appearance, orientation, and psychomotor activity, but plaintiff reported that he felt "terrible" and "suicidal," he could not remember things, and he had trouble getting along with others. (Tr. 1004). In March 2014, Ms. Thomas noted that plaintiff was talking to his neighbor about his thoughts. (Tr. 996). From June to December 2014, Ms. Thomas recorded no significant changes in plaintiff's mental health. (Tr. 961, 968, 975, 982, 987). In December 2014, Ms. Thomas performed a behavioral health assessment of plaintiff and opined that he had appropriate mood, hypersomnia, no hallucinations or delusions, no phobias, appropriate thought process and content, appropriate grooming and dress, appropriate psychomotor activity, appropriate speech and affect, appropriate orientation, and appropriate concentration, but that he had a remote memory deficit, impaired judgment, and limited insight. (Tr. 958-59). She assigned plaintiff a GAF score of 47. (Tr. 960).

In March 2015, Dr. Vasireddy opined that plaintiff does not have any restrictions and does not need any assistance with respect to activities of daily living. (Tr. 894). She noted he has a learning disability and mild deficiencies of concentration and attention span: that he can understand simple instructions but has difficulty sustaining concentration and persistence in tasks. (Tr. 894). She also opined that plaintiff's learning disability can sometimes cause difficulties in maintaining social functioning, and he has minor problems interacting socially and adapting to his environment. (Tr. 894). Dr. Vasireddy observed that plaintiff has not had a job for more than two years and has not been employed since 2009. (Tr. 894). Throughout her treatment of plaintiff, she occasionally assigned him GAF scores of 50 to 55 (Tr. 470, 886, 892), indicative of moderate to serious symptoms and limitations, but more frequently gave him scores of 60 to 70, corresponding to mild to moderate symptoms and limitations. (Tr. 492-94, 496, 520, 523-25, 528-29, 531-35, 537, 893, 895, 903-07, 966, 993, 995).

State agency psychological consultant Keith L. Allen, Ph.D., after reviewing the available evidence of record in March 2015, opined that plaintiff has mild limitations in

his activities of daily living and moderate limitations with respect to social functioning and maintaining concentration, persistence, or pace. (Tr. 700-12). He opined that plaintiff is moderately limited in his abilities to understand, remember, and carry out detailed instructions; has moderate limitations with respect to completing a normal workday and workweek and performing at a consistent pace; and is moderately limited in interacting appropriately with the general public, accepting instructions, and responding appropriately to criticism from supervisors or changes in a work setting. (Tr. 704-05, 709). Dr. Allen concluded plaintiff is capable of performing simple, repetitive tasks that do not require routine interaction with the general public and that he can understand, use his memory, focus, sustain attention, and relate with others in a manner sufficient to adjust to simple, rote occupational activity. (Tr. 708-12).

In September 2015, plaintiff received another psychological consultative examination by Summer D. Johnson, Psy.D. (Tr. 855-63). During this examination, plaintiff took the WAIS-IV and received an IQ score of 74, with subtest scores ranging from 71 to 84. (Tr. 857-58). Dr. Johnson also administered the Wechsler Memory Scale-Fourth Edition, and plaintiff received scores in the extremely low to borderline range. (Tr. 858). On the Trail Making Test, which tests executive functioning, plaintiff received scores within the normal limits. (Tr. 858). In her clinical interview, Dr. Johnson observed that plaintiff demonstrated fair insight and judgment, fair concentration, good persistence, and a moderately fast pace. (Tr. 857, 859). Plaintiff reported that he cooks, helps with household chores, and goes grocery shopping. (Tr. 859).

Dr. Johnson diagnosed plaintiff with major neurocognitive disorder of unknown etiology. (Tr. 859). She opined that plaintiff has memory impairment and slight cognitive deficiencies, which make him mildly limited in his abilities to make judgments on simple work-related decisions and to understand, remember, and carry out simple instructions. (Tr. 861). Dr. Johnson further opined that plaintiff has mild limitations with respect to interacting appropriately with supervisors, coworkers, and the public, and to responding appropriately to usual work situations and changes in a routine work setting. (Tr. 861-62). She opined that plaintiff has moderate limitations in his abilities to

understand, remember, and carry out complex instructions and in his ability to make judgments on complex work-related decisions. (Tr. 861).

In January 2016, Larry M. Kravitz, Psy.D., an impartial medical expert, reviewed the medical evidence of record and opined at the January 7, 2016 hearing that plaintiff would be limited to performing simple, routine, repetitive work tasks. (Tr. 1021). Dr. Kravitz opined that due to plaintiff's combination of psychiatric and cognitive impairments, he would not be able to perform detailed or complex tasks, should work in a setting with few social demands, should be limited to incidental contact with the public, and should not work in a setting requiring involved or complicated interaction with others. (Tr. 1021). He also opined that plaintiff should not work in a setting with strict production quotas, high or unpredictable levels of work stress, or frequent changes in work routine. (Tr. 1021). Dr. Kravitz opined that plaintiff may have difficulty sustaining concentration and persistence but nonetheless retains the ability to perform simple, routine, rote tasks. (Tr. 1021-32). Dr. Kravitz opined that plaintiff would be able to engage in sustained work activity for eight hours per day on a regular and continuing basis within the parameters of these limitations. (Tr. 1021-32). Dr. Kravitz opined that plaintiff's extremely low scores on the WMS-IV would be indicative of profound memory impairment or dementia and of someone who could not be left alone, and these scores are not consistent with the other evidence of record regarding claimant's functioning, including his performance on other tests and his daily activities. (Tr. 1025-32).

In addition, a vocational expert testified at the January 7, 2016 hearing that a person of plaintiff's age, education, work experience, and residual functional capacity would be able to perform the requirements of occupations like kitchen helper/dishwasher, hand packager, and laundry worker. (Tr. 1063-1067). The VE testified that these jobs exist in significant numbers in the national economy.

Throughout the relevant time period, plaintiff reported a variety of activities of daily living, including cooking, going out alone, caring for others, doing many household

chores, grocery shopping, walking places, spending time with neighbors, and playing card and dice games.  (Tr. 43-49, 262-69, 521, 526, 548, 830, 1039-51).

## B.    ALJ's Decision

On remand, the ALJ found that plaintiff had not engaged in substantial gainful activity since his alleged onset date.  (Tr. 614).  He also found that plaintiff suffers from the severe impairments of anterior cruciate ligament tear of the right knee; obesity; major depressive disorder; schizophrenia; generalized anxiety disorder; personality disorder; major neurocognitive disorder; learning disability; and polysubstance dependence in remission.  (Tr. 614-16).  However, the ALJ concluded that none of these impairments, individually or in combination, met or equaled an impairment listed in the Commissioner's regulations.  (Tr. 616-20).

The ALJ determined that plaintiff's impairments left him with the RFC to "perform medium work as defined in 20 C.F.R. 416.967(c)," except that he can lift no more than 50 pounds occasionally, can lift and carry no more than 25 pounds frequently, must avoid all exposure to chemicals and hazardous machinery, is limited to occupations that do not require complex written or frequent verbal communication, is limited to work involving one- or two-step tasks; must work in a low-stress job (one where no decision-making is required, with no changes in the work setting and no production pace work), cannot tolerate interaction with the public, and is limited to only occasional interaction with coworkers, with no tandem tasks.  (Tr. 620).  In making this determination, the ALJ considered the objective medical evidence in the record, opinion evidence, and plaintiff's allegations and testimony.  (Tr. 620-36).

Plaintiff and his representative agreed at the hearing that plaintiff would be able to meet the exertional demands of medium work, which the ALJ found to be consistent with the objective medical evidence.  (Tr. 621, 1040, 1050-51).  However, the ALJ reasoned that the objective medical evidence did not substantiate plaintiff's allegations with regard to his mental impairments.  The ALJ gave little weight to plaintiff's extremely low scores on the WMS-IV, relying on the testimony of the impartial medical expert and noting that

these scores were inconsistent with the WAIS-IV, the Trail Making Test, plaintiff's psychiatric treatment notes, and his activities of daily living. The ALJ noted that although plaintiff has been diagnosed with a learning disability and has testified he needs a pillbox set up by someone else to take his medications appropriately, the record also shows that plaintiff is able to cook meals, do many household chores, grocery shop, walk places, go out alone, play card and dice games, and care for his grandchildren and grandmother.

The ALJ gave great weight to the opinion of Dr. Larry M. Kravitz, Psy.D., the impartial medical expert who testified at the supplemental hearing, because it is generally consistent with and supported by the objective medical evidence of record, comports with plaintiff's fairly routine and conservative treatment history since the application date, and was informed by thorough review of almost all of the medical evidence of record. (Tr. 624-25). The ALJ noted that although Dr. Kravitz did not treat or examine plaintiff, he provided a thorough explanation for his opinion with references to specific findings in the medical records. The ALJ also observed that Dr. Kravitz has specialized knowledge of the disability program and evaluations, as he has served as an impartial medical expert for the Social Security Administration for 30 years.

The ALJ gave limited weight to the opinions of Dr. Jhansi Vasireddy, M.D., plaintiff's treating psychiatrist. (Tr. 625). Although the ALJ recognized that the opinion of a treating physician is ordinarily to be given substantial or controlling weight, he noted the opinion may be discounted if it is inconsistent with the evidence, unsupported by the evidence, or conclusory. (*Id.*). The ALJ found Dr. Vasireddy's opinion to be somewhat internally inconsistent, "as her opinion that [plaintiff] has no limitations with respect to performing activities of daily living conflicts with her opinion that he has difficulty sustaining concentration and persistence on tasks, which would presumably apply to tasks like the daily activities of cooking and doing household chores." (Tr. 626). The ALJ did not see any significant abnormal findings of concentration, attention, or thought processes in Dr. Vasireddy's treatment notes that would support her opinion regarding plaintiff's difficulty sustaining concentration and persistence in tasks. (*Id.*). The ALJ

also observed that Dr. Vasireddy provided little explanation or citation to specific objective findings in support of her opinion and improperly relied on plaintiff's vocational background in evaluating his functional limitations. (*Id.*). Finally, the ALJ noted that the GAF scores Dr. Vasireddy assigned considered psychosocial stressors like legal and financial problems, which are not appropriately factored into RFC determinations. (*Id.*).

The ALJ also gave limited weight to the opinion of Summer D. Johnson, Psy.D., a psychological consultative examiner, because he found the evidence of record does not support the extreme interpersonal restrictions articulated in her opinion. (Tr. 626-27). The ALJ discounted Dr. Johnson's opinion because it is based on a one-time examination of plaintiff, and Dr. Johnson did not review any of plaintiff's prior medical records before examining him or rendering her opinion. (Tr. 626-27). The ALJ also found her opinion failed to consider the effects of plaintiff's anxiety and personality disorders and was therefore not comprehensive.

The ALJ gave limited weight to the opinion Keith L. Allen, Ph.D., the state agency consultant. (Tr. 627). He found Dr. Allen's opinion to be "fairly consistent" with the objective medical evidence and "generally consistent" with plaintiff's activities of daily living, but noted that Dr. Allen's opinion was based upon review of only a limited portion of the evidence of record, was not informed by analysis of all of the evidence of record, and only referenced medical records from 2014. The ALJ determined that Dr. Allen's opinion was therefore less probative in determining plaintiff's RFC during the entire period of alleged disability. (Tr. 627).

The ALJ also gave little weight to the opinions of Gina Insalaco, M.A., L.P.C., plaintiff's counselor, because she is not an acceptable medical source and he found her opinions to be inconsistent with plaintiff's contemporaneous treatment notes and treatment history. (Tr. 627-28). The ALJ gave little weight to the opinions of another of plaintiff's counselors, Norinee Thomas, M.A., P.L.P.C. (Tr. 630). The only opinions Ms. Thomas provided were GAF scores of 49 and 47, indicating serious symptoms and limitations. The ALJ discounted these scores because GAF scores by themselves "are not

13

standardized or based on normative data, do not predict prognosis or treatment outcomes, do not directly correlate to the severity requirements in mental disorder listings or any specific functional limitations, and do not represent specific objective findings." (Tr. 630). The ALJ also noted that Ms. Thomas improperly considered economic problems in assigning the GAF scores. He observed that she is not an acceptable medical source and had a fairly brief treating relationship with plaintiff.

The ALJ gave little weight to the opinions of examining forensic psychologists Gordon M. Zilberman, Ph.D., and Richard G. Scott, Ph.D. (Tr. 628). He observed that their opinions preceded the application date of October 20, 2010, and discussed plaintiff's ability to understand his legal situation and assist in his own defense, with no opinion on the expected duration of plaintiff's competency or lack thereof. (Tr. 629). The ALJ noted that their opinions did not discuss plaintiff's abilities to perform basic mental work activities and were therefore not probative in assessing plaintiff's RFC. (Tr. 629).

The ALJ similarly discounted the opinions of Bruce Berger, M.D., and Jill R. Grant, Psy.D., who also performed forensic evaluations of plaintiff. (Tr. 629-30). Drs. Berger and Grant evaluated plaintiff's competency to stand trial in his criminal case prior to plaintiff's application date, and he found this limited scope to diminish the probative value of the opinions in evaluating plaintiff's RFC. (Tr. 630). The opinions do not describe any specific functional limitations or abilities.

Finally, the ALJ gave little weight to the opinion of M. Asif Qaisrani, M.D., plaintiff's prior treating psychiatrist, which consisted of a GAF score of 51 given in 2006. (Tr. 631). This opinion predates plaintiff's application by several years, and the GAF score alone does not articulate any specific functional limitations or abilities and relies on the consideration of improper factors. The ALJ found it was not probative for assessing plaintiff's RFC as of the alleged period of disability.

At Step Five, the ALJ relied on the testimony of the VE to find that there were jobs in significant numbers in the national economy that a person with plaintiff's RFC and age, education, and work experience could perform. (Tr. 636-37). Accordingly, the ALJ concluded that plaintiff was not disabled. *Id.*

## II.    DISCUSSION

Plaintiff argues that the ALJ erred in according "little" weight to the opinion of plaintiff's treating mental health counselor, in according the opinion of plaintiff's treating psychiatrist "limited" weight, and in failing to consider plaintiff's structured setting requirements. (Doc. 17). The court disagrees.

## A.    General Legal Principles

In reviewing the denial of Social Security disability benefits, the court's role is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. *Id.* As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. *See Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011).

To be entitled to disability benefits, a claimant must prove that he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 CFR § 404.1520(a)(4); *see also Pate-Fires*, 564 F.3d at 942 (describing the five-step process).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his severe impairment(s) meets or equals a listed impairment. 20 C.F.R. §

416.920(a)(4)(i)-(iii).  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW).  *Id. at* § 416.920(a)(4)(iv).  The claimant bears the burden of demonstrating he is no longer able to return to his PRW.  *Pate-Fires*, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show that the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  *Id.*; 20 C.F.R. § 416.920(a)(4)(v).

### B.    Evaluation of Opinions

An ALJ must give good reasons for the weight he or she assigns to the opinions in the record.  *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015).  Factors for evaluating opinion evidence include the relationship between a treating source and the claimant, including the length, nature, and extent of examination; the degree to which the source presents an explanation and evidence to support an opinion; how consistent the opinion is with the record as a whole; and the training and expertise of the source.  *See* 20 C.F.R. § 416.927; SSR 06-3p.

In this case, the ALJ gave "little weight" to the majority of the opinions in the record, including those of plaintiff's counselor, Gina Insalaco, and plaintiff's treating physician, Dr. Jhansi Vasireddy.  Plaintiff argues that the ALJ erred in discounting their opinions.

As to Ms. Insalaco, plaintiff argues that her opinion should be considered that of an acceptable medical source because her treatment was overseen by Dr. Vasireddy.  Ms. Insalaco began treatment of plaintiff at the recommendation of Dr. Vasireddy, and plaintiff saw the counselor and the psychiatrist as a "treating team."  (Doc. 17 at 4).  Dr. Vasireddy provided medication management and Ms. Insalaco provided hour-long mental treatment sessions.  (*Id.*).  Dr. Vasireddy and Ms. Insalaco work at the same facility and often saw the plaintiff on the same day.  (*Id.*).  Accordingly, plaintiff argues that Ms.

Insalaco's opinions should be given treating-source status, because her work was overseen by an acceptable medical source.

However, even if the ALJ had considered Ms. Insalaco to be an acceptable medical source, the ALJ discounted her opinion for legally acceptable reasons other than her status. The ALJ found them to be internally inconsistent and not supported by plaintiff's contemporaneous psychiatric treatment notes or treatment history. (Tr. 628). The ALJ did acknowledge that Ms. Insalaco had a treating relationship with plaintiff, but there is no indication the ALJ would have given the opinion any additional weight even if he had considered her to be an acceptable medical source. (Tr. 627-28).

As for Dr. Vasireddy, plaintiff argues that the ALJ should have afforded Dr. Vasireddy's opinion more weight as plaintiff's treating psychiatrist. (Doc. 17 at 4-7). Treating physicians are generally able to provide the most "detailed, longitudinal picture" of the nature of a plaintiff's impairments and are therefore generally entitled to greater weight. 20 C.F.R. § 416.927(d)(2); 56 Fed. Reg. 36,932, 36,935 (Aug. 1, 1991) This entitlement is subject to some exceptions, however: a treating physician's opinion "may be discounted or entirely disregarded where other medical assessments are supported by better or more thorough medical evidence." *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015) (citations omitted). Similarly, when a treating source's examination notes are inconsistent with his or her own opinion, the ALJ may decline to give that source controlling weight. *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).

Plaintiff argues that Dr. Vesireddy's opinion is internally consistent and supported by the medical evidence. More specifically, plaintiff asserts that Dr. Vasireddy's opinion that he has no limitations in activities of daily living does not conflict with her opinion that he has difficulty sustaining concentration and persistence on tasks, because the ability of plaintiff to perform activities of daily living does not reflect the quality of the activities being performed. Plaintiff argues that the activities of daily living he does perform – basic, occasional cleaning; basic cooking; and helping with chores after being told to – are not indicative of an ability to work full-time. While the ALJ does qualify this reasoning by noting that the opinion is only "somewhat" internally inconsistent, the

court agrees with plaintiff. A person can be capable of completing certain activities of daily living without limitation but still have mild difficulties sustaining concentration and persistence in certain tasks. This is not so inconsistent that it warrants discounting the opinion of a psychiatrist who met with plaintiff 6-12 times a year for over five years.

Plaintiff also asserts that Dr. Vasireddy's opinion regarding plaintiff's concentration and persistence is, contrary to the ALJ's decision, supported by the record and her treatment notes. The ALJ concluded that "Dr. Vasireddy's opinion is fairly consistent with the objective findings reflected in her treatment notes of the claimant, although her treatment notes do not document significant abnormal findings of concentration, attention, or thought processes that would fully support her opinion regarding the claimant's difficulty sustaining concentration and persistence in tasks." (Tr. 626). Plaintiff argues that the treatment notes document the abnormal finding of akathisia, which is a feeling of inner restlessness that plaintiff reported as a side effect of his medication. (Tr. 493, 496, 524, 885, 886, 895, 903, 904, 905, 970, 989, 993, 995, and 998) (describing findings of "mild akathisia" but also findings that plaintiff's thought process is goal-directed).

The court is not persuaded that Dr. Vasireddy's opinion that plaintiff had "mild" limitations in concentration and persistence requires "significant" abnormal findings, and the ALJ's decision to the contrary is not supported by substantial evidence. The ALJ provided several additional reasons for discounting Dr. Vasireddy's opinion – it provides little explanation, it includes no citation to specific objective findings, and it considers the inappropriate factor of plaintiff's vocational background – but these are all insufficient to discount treating physician Dr. Vasireddy's opinion entirely, especially when there are no other medical assessments by examining sources to which the ALJ gave any credit. (Tr. 676); *see Andrews*, 791 F.3d at 928 (holding an ALJ may discount a treating source's opinion when other medical assessments are supported by better or more thorough evidence); *see also Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) ("The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole."). The only source to whom the ALJ gave great

weight, impartial expert Dr. Kravitz, considered plaintiff to have moderate restrictions in concentration, pace, and persistence. (Tr. 1021). The medical evidence supports Dr. Vasireddy's and Dr. Kravitz' opinions that plaintiff has limitations in this regard, and the record contains no evidence to the contrary. Accordingly, the ALJ erred in giving Dr. Vasireddy's opinion on this matter limited weight.

However, although the ALJ discounted Dr. Vasireddy's opinion, the ALJ's RFC determination reflects restrictions equal or greater to the ones Dr. Vasireddy recommended. Dr. Vasireddy opined that plaintiff needs no restrictions in and does not require assistance with daily activities of living. (Tr. 894). She also opined that he has mild deficiencies of concentration and attention span: he can understand simple instructions, but has difficulty sustaining concentration and persistence in tasks. She noted he has minor problems in maintaining social functioning and adapting to his environment. The ALJ's RFC determination encompasses each of these limitations. The ALJ limited plaintiff to occupations that do not require complex written or frequent verbal communication, work involving one- or two-step tasks, a low-stress job (one where no decision-making is required, with no changes in the work setting and no production pace work), no interaction with the public, only occasional interaction with coworkers, and no tandem tasks. (Tr. 620).

Accordingly, even though the ALJ only gave Dr. Vasireddy's opinion limited weight, his RFC determination is consistent with Dr. Vasireddy's opinion. In other words, if the ALJ had given the opinion more weight or even controlling weight, it would not have impacted the RFC determination in an outcome-determinative way. If there is no indication that an ALJ would have decided differently absent an error, that error by the ALJ is harmless. *Van Vickle v. Astrue*, 539 F.3d 825, 830-31 (8th Cir. 2008); *see also Renfrow v. Astrue,* 496 F.3d 918, 921 (8th Cir. 2007) (holding that an ALJ's failure to ask a VE about possible conflicts between his testimony and the *Dictionary of Occupational Titles* was harmless, because no such conflict appeared to exist).

## C. **Determination of Plaintiff's RFC**

Plaintiff also argues that the ALJ failed to consider a structured setting in determining his RFC. (Doc. 17 at 7-9). The Commissioner's Listing of Impairments states that an individual's ability to complete tasks in highly structured or supportive settings does not necessarily demonstrate his ability to complete tasks in the context of regular employment. 20 C.F.R. Part 404, Subpart P, App'x 1, § 12.00(C)(6). The regulations provide that in these cases, the Commissioner must consider "the kind and extent of supports you receive, the characteristics of any structured setting in which you spend your time, and the effects of any treatment." *Id.* at § 12.00(D). This requirement applies to the Commissioner's determination of whether plaintiff's impairments meet a Listing, at Step Two. Plaintiff argues that the ALJ also should have considered this factor in determining plaintiff's RFC at Step Four.

At Step Two, the ALJ explicitly determined that the evidence did not show plaintiff had "the highly supportive living arrangement contemplated in the [paragraph C] criteria." (Tr. 619). The ALJ recognized and considered the support and structure plaintiff received from his family and some healthcare providers, and the ALJ discussed related evidence in his decision: testimony and treatment notes regarding what supports, if any, plaintiff needed for taking prescription medications appropriately (Tr. 262-72, 492, 501-03, 516, 617, 830, 886, 913-14, 960); testimony that he needed some encouragement to do household chores and could count change but not otherwise handle his finances (Tr. 262-72, 617, 828-38); reports of plaintiff's difficulty getting along with others and a tendency to isolate himself (Tr. 262-72, 465-77, 489-512, 519-601, 617, 828-38, 884-918); and evidence that his family members provided social and mental support. (Tr. 37-50, 262-72, 465-77, 489-512, 519-601, 617-18, 828-38, 884-918, 943-1011, 1035-39, 1041-61). The ALJ noted that plaintiff had not been unable to care for himself and had not needed to live in an assistive facility. (Tr. 618). The ALJ considered the support plaintiff receives but concluded that plaintiff's impairments do not meet a listing under the "paragraph B" criteria, because he has only moderate difficulties in activities of daily living and in social functioning, not marked restrictions, and because he

has not had any episode of decompensation. (Tr. 617-18). With regard to "paragraph C" criteria, and again considering the support plaintiff receives, the ALJ determined that plaintiff's impairments do not meet a listing, because plaintiff has had no documented episodes of decompensation, there is no evidence a change in plaintiff's environment or mental demands would cause decompensation, and there is no evidence plaintiff has a complete inability to function independently outside his home. (Tr. 617-19).

The ALJ thoroughly considered the support plaintiff receives from family members and from medication, and decided at Step Two that his impairments do not meet a listing. To the extent plaintiff argues the ALJ failed to consider plaintiff's structural support requirements at Step Four, this argument is without merit for the same reasons: the ALJ discussed the same evidence in determining how much plaintiff can do despite his limitations, and there is substantial evidence in the record supporting his RFC determination. (Tr. 620, 624-30, 632-36).

## III.  CONCLUSION

For the reasons set forth above, the final decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.


_____/S/   David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**


Signed on February 8, 2018.